**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| **MEASUREMENT SPECIALTIES, INC.,**<br><br>Plaintiff and<br>Counterclaim Defendant,<br><br>v.<br><br>**EXERGEN CORPORATION,**<br><br>Defendant and<br>Counterclaim Plaintiff,<br><br>v.<br><br>**JOHN DOES 1-10, et al.,**<br><br>Defendants. | Civil Action No.<br>25-cv-11929-FDS |

**MEMORANDUM AND ORDER ON COUNTERCLAIM DEFENDANT**
**MEASUREMENT SPECIALTIES, INC.'S MOTION TO DISMISS COUNTERCLAIM**

**SAYLOR, J.**

This is a contract case involving the sale of goods. Jurisdiction is based on diversity of citizenship. Defendant and counterclaim plaintiff Exergen Corporation manufactures medical thermometers. It purchased thermopile sensors from counterclaim defendant Measurement Specialties, Inc. ("MEAS") to incorporate into its products. MEAS declined to deliver more thermopiles until Exergen agreed to a price increase, which it refused to accept.

MEAS brought suit against Exergen for breach of contract, promissory estoppel, and quantum meruit. Exergen asserted a counterclaim for breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of Mass. Gen. Laws. ch. 93A. MEAS has moved to dismiss the counterclaim. For the following reasons, that motion will be denied.

I.      **Background**

On a motion to dismiss, a court may consider documents attached to the complaint (or, here, counterclaim).  *See Trans-Spec Truck Serv., Inc. v. Caterpillar Inc.*, 524 F.3d 315, 321 (1st Cir. 2008).  Here, Exergen attached to its counterclaim MEAS's quote (Quote, Dkt. No. 8-1); Exergen's purchase order (Purchase Order, Dkt. No. 8-2), which included its terms and conditions (Exergen Terms, Dkt. No. 8-2); MEAS's order acknowledgment (Order Acknowledgment, Dkt. No. 8-3); an email MEAS sent Exergen demanding a price increase (Price Increase Email, Dkt. No. 8-4); and Exergen's email cancelling the contract (Cancellation, Dkt. No. 8-5).  Those documents may properly be considered in resolving the motion to dismiss.

A court may also consider documents that are incorporated by reference whose authenticity is undisputed.  *See Newman v. Lehman Bros. Holdings Inc.*, 901 F.3d 19, 27 (1st Cir. 2018).  Here, the counterclaim explicitly refers to the terms and conditions that MEAS incorporated into its quote and its order acknowledgment.  (Counterclaim ¶¶ 21, 28, Dkt. No. 8).

Nonetheless, Exergen contends that the actual terms and conditions document that MEAS has proffered cannot be the terms incorporated into MEAS's quote because that document is dated one month after the quote.  (MEAS Terms, Dkt. No. 1-2).  It does not appear to dispute, however, that the substance of those terms are the ones incorporated into MEAS's order acknowledgment.  For that reason, the Court will consider those terms and conditions in the context of the order acknowledgment.

A.      **The Allegations of the Counterclaim**

Exergen Corporation is a Massachusetts corporation with a principal place of business in Massachusetts.  (Counterclaim ¶ 1, Dkt. No. 8).  It designs and manufactures noninvasive thermometers that measure heat emitted from the temporal artery in the forehead.  (*Id.* ¶ 6).

Measurement Specialties, Inc. ("MEAS") is a New Jersey corporation with a principal

place of business in Virginia. (*Id.* ¶ 2). It manufactures thermopile sensors, which are a component of Exergen's temporal thermometers. (*Id.* ¶ 13). At the relevant time, MEAS was one of two suppliers with thermopiles validated and approved for use in Exergen devices. (*Id.*).

Demand for Exergen's temporal thermometers "skyrocketed" during the Covid-19 pandemic. (*Id.* ¶ 8). In response, Exergen decided to increase production. (*Id.* ¶ 12). That required purchasing additional parts, including thermopiles. (*Id.*). It only considered using previously approved suppliers because production was time-sensitive and approval of new ones generally took more than a year. (*Id.* ¶ 14).

On June 17, 2020, MEAS issued a quote to Exergen for 4 million thermopiles at the price of $1.30 each. (Quote). The quote stated that it was valid from June 17, 2020, to August 16, 2020. (*Id.*).

On September 10, 2020, Exergen sent a purchase order to MEAS for 4 million thermopiles at a price of $1.30 each. (Purchase Order). The purchase order set forth a fixed delivery schedule for 22 separate shipments beginning November 1, 2020, and ending August 1, 2022. (*Id.*). It also set forth specific terms and conditions. Among other things, those terms stated that the specified delivery dates form "the essence of the contract" and gave Exergen "the right to cancel this contract" if not followed. (Exergen Terms ¶ 9). The terms also instructed MEAS not to ship parts "[i]f the prices are higher than specified." (*Id.* ¶ 17). It further provided that "[n]one of the terms and conditions . . . may be added to, modified, superseded or otherwise altered except by a written instrument signed by an authorized representative of [Exergen]." (*Id.* ¶ 20).

Two weeks later, on September 22, MEAS replied with an order acknowledgment for the delivery of 4 million thermopiles at a price of $1.30 each. (Order Acknowledgment). That order

acknowledgment set forth its own delivery schedule for 22 shipments that began two months later than Exergen's proposed schedule and that ended on August 25, 2022. (*Id.*). It also provided that "[c]ustomer's order is accepted on the express condition that the terms and conditions set forth on [the MEAS website] . . . shall apply and such terms and conditions constitute the complete agreement between the parties." (*Id.*).

The MEAS terms and conditions included a choice-of-law provision mandating that the agreement and the sale of goods under it "shall be governed by and construed in accordance with the laws of the State in which Seller is located." (MEAS Terms ¶ 23). In addition, the terms provided that "prices are subject to change without notice and may be subject to any increase which may be in effect on the date of shipment," "[d]elivery or shipping dates are approximate only," and that Exergen could not cancel the contract without the written approval of MEAS. (*Id.* ¶¶ 3, 4, 17).

Initially, MEAS sent and Exergen accepted shipments of thermopile sensors at a price of $1.30. Exergen received the last such shipment on May 5, 2022. (Counterclaim ¶ 33). It appears that MEAS shipped 2.75 million thermopiles, 1.25 million fewer than the amount set forth in the Exergen purchase order.

On May 16, 2022, MEAS sent an email to Exergen explaining that its costs had increased and it would therefore be increasing the price of all open or partially filled orders. (Price Increase Email). It stated that it would not release any shipments until the prices had been updated. (*Id.*). Two days later, Exergen responded that it would not agree to any price adjustment. (Counterclaim ¶ 39). The following month, MEAS replied that it would not send any further shipments without a revised purchase order reflecting increased prices. (*Id.* ¶ 40).

On July 5, 2022, Exergen sent a formal cancellation of the purchase order to MEAS.

(Counterclaim ¶ 42).  The notice stated that the cancellation was due to the requested price increase and failure to deliver the parts on the agreed date.  (Cancellation).

The counterclaim alleges that as a result of MEAS's failure to timely deliver the thermopile sensors at the agreed-upon price, Exergen did not have the necessary parts to manufacture 1.25 million thermometers to meet market demand.  (Counterclaim ¶ 48).  It lost profits on the sale of those units, was forced to triage shipments to its existing customers, lost repeat business from customers who were unable to place orders, lost business opportunities to secure new customers and grow its market share, and lost goodwill for its business.  (*Id.* ¶¶ 50-55).  At some point, it began purchasing thermopiles from a different supplier.  (*Id.* ¶ 56).

### B.      Procedural Background

On August 8, 2024, MEAS brought suit in the District of New Jersey alleging that Exergen breached its contract by failing to accept and pay for its custom parts.  *See Measurement Specialties, Inc. v. Exergen Corp.*, 24-cv-08369 (D.N.J.).  That court dismissed the case for lack of personal jurisdiction over Exergen.

On July 8, 2025, MEAS brought this action in the District of Massachusetts.  Exergen filed an answer and counterclaim on October 6, 2026.  The counterclaim asserts three counts:  (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) and violation of Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A.  MEAS has moved to dismiss the counterclaim for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6).  (Dkt. No. 9).

## II.     Standard of Review

To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the

assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555

(citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*,

556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).

When determining whether a complaint satisfies that standard, a court must assume the

truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See*

*Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*,

175 F.3d 75, 77 (1st Cir. 1999)). In addition to well-pleaded facts, a court may consider

documents incorporated by reference into the complaint, matters of public record, and facts

susceptible to judicial notice. *Grajales v. Puerto Rico Auth.*, 682 F.3d 40, 44 (1st Cir. 2012). A

court may also consider documents central to the plaintiff's claims whose authenticity is not

disputed by the parties, even when those documents are incorporated into the movant's

pleadings. *Cousins v. Curran*, 509 F.3d 36, 44 (1st Cir. 2007); *see also Beddall v. State St. Bank*

*& Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998).

Dismissal is appropriate if the complaint fails to set forth "factual allegations, either

direct or inferential, respecting each material element necessary to sustain recovery under some

actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting

*Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

III.    **Analysis**

    A.    **Choice of Law**

The first issue before the court is a choice-of-law dispute. MEAS contends that the

choice-of-law provision in its terms of service governs. That provision selects "the laws of the

State in which Seller is located." (MEAS Terms ¶ 23). According to MEAS, that means the

laws of Virginia (its operating location). Exergen contests that the choice-of-law provision

forms part of the contract between the parties.  Absent an agreed-upon choice-of-law provision, it contends that Massachusetts law governs.  The choice-of-law dispute is thus a part of the dispute over contract formation.

The antecedent question is what law governs the contract-formation analysis.  "The first step in a choice-of-law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions."  *Reicher v. Berkshire Life Ins. Co. of Am.*, 360 F.3d 1, 4 (1st Cir. 2004).  Here, both Massachusetts and Virginia have enacted the relevant portions of the Uniform Commercial Code ("UCC") and there appears to be no material differences in their other laws concerning contract formation.[1]  Accordingly, the Court does not need to resolve what jurisdiction's laws apply to contract formation.  *See Lambert v. Kysar*, 983 F.2d 1110, 1114 (1st Cir. 1993) ("We need not resolve the [choice-of-law] issue, however, as the outcome is the same under the substantive law of either jurisdiction.").

It is undisputed that the agreement between MEAS and Exergen is a contract for the sale of goods governed by Article 2 of the UCC.  As with common-law contracts, contracts formed under the UCC require an offer and valid acceptance.  *See* Mass. Gen. Laws ch. 106, §§ 2-206, 2-207(1); Va. Code Ann. §§ 8.2-206, 8.2-207(1).  However, unlike the common-law mirror-image rule, the UCC does not require complete consistency in terms between an offer and an acceptance for a valid contract to be formed.  Section 2-207 of the UCC provides as follows:

> (1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

> (2) The additional or different terms are to be construed as proposals for addition to the contract.  Between merchants such terms become part of the contract

---

[1] *Compare* Mass Gen. Laws ch. 106, *with* Va. Code Ann. § 8.1A *et seq.*

unless:

> (a) the offer expressly limits acceptance to the terms of the offer;
> (b) they materially alter it; or
> (c) notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

> (3) Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract.  In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this chapter.

Mass. Gen. Laws ch. 106, § 2-207; Va. Code Ann. § 8.2-207.

This case appears to present a "classic 'battle of the forms' sale, in which a buyer and a seller each attempt to consummate a commercial transaction through the exchange of self-serving pre-printed forms that clash, and contradict each other, on both material and minor terms." *Softub, Inc. v. Mundial, Inc.*, 53 F. Supp. 3d 235, 249 (D. Mass. 2014) (citation modified).  There are three documents potentially relevant to that analysis:  MEAS's June 2020 quote; Exergen's September 2020 purchase order; and MEAS's September 2020 order acknowledgment.

MEAS contends the June 2020 quote constitutes the offer and the September 2020 purchase order constitutes an acceptance.  That is clearly incorrect.  Even if the quote was an initial offer rather than a mere invitation for an offer, the purchase order was not an acceptance.

The quote explicitly states that it is valid from June 17, 2020, to August 16, 2020.  Exergen sent the September 2020 purchase order *after* the quote's August 2020 expiration.  The offer therefore lapsed on its own terms before any acceptance.  The September 2020 purchase order was defective as an acceptance and instead operated as a new offer.  *See* Restatement (Second) of Contracts § 41 (1981) ("An offeree's power of acceptance is terminated at the time

8

specified in the offer . . . ."); *id.* § 70 ("A late or otherwise defective acceptance may be effective as an offer to the original offeror . . . .").[2]

That new offer—that is, the one set forth in the Exergen purchase order—was never accepted. MEAS's order acknowledgment did not constitute an acceptance of the offer because it was conditioned on assent to different terms. Section 2-207 states that "a definite and seasonable expression of acceptance or a written confirmation . . . operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms*." Mass. Gen. Laws ch. 106, § 2-207(1); Va. Code Ann. § 8.2-207(1) (emphasis added). The order acknowledgment stated that the order "is accepted on the express terms and conditions set forth on [its] website . . . and such terms and conditions shall constitute the complete agreement between the parties." (Order Acknowledgment). Because MEAS's order acknowledgment made its acceptance expressly conditional on assent to its additional terms, it could not "operate[] as an acceptance" of Exergen's purchase order. Mass. Gen. Laws ch. 106, § 2-207(1); Va. Code Ann. § 8.2-207(1).

Nonetheless, the parties did in fact enter into some form of a contract according to their subsequent conduct pursuant to § 2-207(3). Under that provision, "the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." Mass. Gen. Laws ch. 106, § 2-207(3); Va. Code Ann. § 8.2-207(3). That means the contract contains any "common

---

[2] The UCC does not have a specific provision governing the late acceptance of an offer with a definite deadline. Section 2-207(1) governs "seasonable" acceptances—that is, an acceptance "taken at or within the time agreed, or, if no time is agreed, at or within a reasonable time." Mass. Gen. Laws ch. 106, § 1-205; Va. Code Ann. § 8.1A-205. With no written provision on point, common law fills in the gaps. Mass. Gen. Laws ch. 106, § 1-103(b); Va. Code Ann. § 8.1A-103(b).

terms" in the parties' writings and the UCC's gap-filling provisions. *Commerce & Indus. Ins. Co. v. Bayer Corp.*, 433 Mass. 388, 395 (2001); *see Roanoke Cement Co. v. Falk Corp.*, 413 F.3d 431, 434-5 (4th Cir. 2005). All other terms are rejected. *Bayer Corp.*, 433 Mass. at 395; *see Roanoke Cement Co.*, 413 F.3d at 435. Because the choice-of-law clause is not a common term, whatever the contract between the parties, it contains no agreed-upon choice of law.

Exergen maintains that absent a choice-of-law provision, Massachusetts law governs. MEAS makes no argument to the contrary. A federal court sitting in diversity must apply the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). For contract claims, Massachusetts applies a "functional choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole" that takes guidance from the Restatement (Second) of Conflicts. *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631 (1985); *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 188 F. Supp. 2d 115, 118 (D. Mass. 2002). Under the approach taken by the Restatement, a contract for the sale of goods is generally governed by the law of the place of delivery, as delivery is generally considered the most significant stage of the sales transaction. Restatement (Second) of Conflict of L. § 191 (1971). Here, the state of delivery is Massachusetts.

In sum, under Massachusetts and Virginia law, which are identical in all relevant respects, there was no offer and acceptance. The parties instead formed a contract according to their subsequent conduct pursuant to § 2-207(3) of the UCC. That contract does not contain a choice-of-law clause. Absent such a provision, Massachusetts law governs this dispute.

## B.    <u>Breach of Contract (Count 1)</u>

The counterclaim alleges that MEAS breached its contract with Exergen by failing to deliver the thermopile sensors at the price and on the timeframe specified by the September 2020

10

purchase order form.  MEAS contends that (1) its conduct does not breach the terms of the contract and (2) Exergen has not plausibly pleaded the damages element of a breach of contract claim.  The Court will address each ground for dismissal in turn.

### 1.    The Terms of the Contract

The first question is whether the Court can determine the terms of the contract under § 2-207(3) of the UCC.  As noted, under that provision, the Court accepts "common terms" in the parties' writings, "rejects all the rest," and fills the gaps with the UCC's gap-filling provisions. *Bayer Corp.*, 433 Mass. at 395.

The writings agree on the product to be purchased (thermopile sensors); the size of the order (4 million); the general timing of shipment and payment (by installment); the number of shipments (22); and the price ($1.30 per unit).  They diverge on the ability of the seller to adjust the price and the delivery schedule.

Exergen's purchase order set forth a fixed price and a fixed deadline:  it states that product is not to be shipped above the specified price and that the proposed delivery dates are of "the essence of [the] contract."  (Exergen Terms ¶¶ 9, 17).  MEAS's order acknowledgement sets forth an adjustable price and a flexible deadline:  its "prices are subject to change without notice and may be subject to any increase," and its "[d]elivery and shipping dates are approximate only" and "[t]ime is not of the essence."  (MEAS Terms ¶¶ 3, 4).

Because those terms are not consistent, they do not form part of the contract.  Under the UCC's gap-filling provisions, the contract includes a "reasonable" delivery time and a "reasonable price at the time for delivery."  Mass. Gen. Laws ch. 106, §§ 2-305, 2-309.  A reasonable time "depends on the nature, purpose, and circumstances of the action." *Id.* § 1-205. A reasonable price depends on "the parties' course of dealing, course of performance, usage of trade, or the fair market value of the goods, or a formula agreed upon by the parties." *Fischer*

*Imaging Corp. v. Gen. Elec. Co.*, 187 F.3d 1165, 1173 (10th Cir. 1999).  Reasonableness also turns on the parties' good faith in light of "commercial standards of fair dealing."  *See* Mass. Gen. Laws. ch. 106, §§ 1-304, 1-201(20).  And because the contract involved delivery and payment in installments, there is a question as to whether the contract is terminable at will; terminable upon reasonable notice; or not terminable at all.

Those are questions that appear to turn on a number of different evidentiary issues, and therefore cannot be resolved on a motion to dismiss.  *See Fischer Imaging Corp.*, 187 F.3d at 1173 (holding that the question of a reasonable price for goods under [§ 2-305] is a question for the jury); *cf. Galvin v. U.S. Bank, N.A.*, 852 F.3d 146, 164 (1st Cir. 2017).[3]

### 2.    **Damages**

MEAS further contends that Exergen has failed to plausibly plead the damages element of a breach of contract claim.  It maintains that the alleged damages are conclusory and unsupported by facts, and that Exergen seeks to recover special damages that must be pleaded with specificity under Rule 9(g).

The Federal Rules of Civil Procedure establish different pleading standards for general and special damages.  "General damages typically are those elements of injury that are the proximate and foreseeable consequences of the defendant's conduct" and may be "alleged without particularity" under Rule 8(a).  5A Wright & Miller's Federal Practice & Procedure § 1310 (4th ed. 2026).  In contrast, "[s]pecial damages are those elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct, and typically

---

[3] In addition, MEAS appears to contend that Exergen's alleged breach of contract means that its counterclaim must fail.  However, any breach by Exergen does not mean that MEAS did not breach first by failing to deliver the thermopiles at a reasonable price within a reasonable time.  Exergen has not moved to dismiss the complaint, and therefore whether its cancellation constitutes a breach of contract is not before the Court at this time.

stem from and depend upon the particular circumstances of the case." *Id.*  Rule 9(g) requires that "[i]f an item of special damage is claimed, it must be specifically stated."  Fed. R. Civ. P. 9(g).

The distinction between the two is often unclear.  *Santos Arrieta v. Hospital del Maestro*, 2018 WL 11441766, at *1 (D.P.R. Aug. 14, 2018) (citing Wright & Miller § 1310).  The Seventh Circuit has explained that special damages "are damages that are unusual for the type of claim in question."  *Avitia v. Metropolitan Club of Chi., Inc.*, 49 F.3d 1219, 1226 (7th Cir. 1995).  For example, "[d]amages for personal injury are unusual in commercial cases, normal in tort cases; lost profits are normal in contract cases, unusual in personal injury tort cases."  *Id.*

The purpose of pleading with specificity is to give adequate notice to the opponent. *Suarez Matos v. Ashford Presbyterian Cmty. Hosp., Inc.*, 4 F.3d 47, 52 (1st Cir. 1993).  It serves "to protect the defendant against being surprised at trial by the extent and character of the plaintiff's claim" and "permit the most advantageous use of the discovery procedures in preparing a defense."  Wright & Miller § 1310.  Allegations of special damages are generally sufficient "if they are definite enough to notify the opposing party and the court of the nature of the damages and enable the preparation of a responsive pleading."  *Id.* § 1311.

At a minimum, the counterclaim plausibly pleads general damages based on lost profits. A buyer's lost profits are a natural consequence of a seller's breach of contract and not subject to Rule 9(g)'s specificity requirement.  *See Jetpac Grp., Ltd. v. Bostek, Inc.*, 942 F. Supp. 716, 720 (D. Mass. 1996) (citing *Hendricks & Assocs. v. Daewoo Corp.*, 923 F.2d 209, 213 (1st Cir.1991)).  The counterclaim alleges that MEAS breached by failing to timely deliver 1.25 million thermopile sensors at the agreed-upon price.  Without that part, Exergen could not manufacture and sell 1.25 million thermometers to meet the heightened demand for its products. It alleges that, among other injuries, it suffered lost profits from current customers whose orders

it could not fulfill.  That is sufficient to survive a plausibility pleading standard.  The resolution of further factual issues—such as Exergen's capacity to manufacture the 1.25 million additional thermometers, reasonable measures it took to prevent loss, and specific customer orders it was unable to fulfill—will await further development of the evidence.

The Court need not decide whether Exergen's other asserted damages, such as lost business opportunities and lost goodwill, constitute special damages.  Where, as here, special damages merely supplement general damages, a failure to meet the specificity requirement of Rule 9(g) does not warrant dismissal of the claim.  *See* Wright & Miller § 1312.  Rather, failure to plead special damages with specificity "merely bars recovery for the items of special damage that are not set forth in the pleading."  *Id.*  If MEAS believes that it does not have sufficient notice to prepare a responsive pleading, it may move for a more definite statement under Rule 12(e).  *See id.*

### C.    Breach of the Implied Covenant of Good Faith and Fair Dealing (Count 2)

Under Massachusetts law, a covenant of good faith and fair dealing is implied in every contract.  *Weiler v. PortfolioScope, Inc.*, 469 Mass. 75, 82 (2014).  It "provides that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.* (citation modified).  "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance."  *UNO Rests., Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

"Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims . . . ."  *Christensen v. Kingston Sch. Comm.*, 360 F. Supp. 2d 212, 229 (D. Mass. 2005).  Breach of an express term of the contract is not a prerequisite to finding a breach of the implied covenant.  *See Speakman v. Allmerica Fin. Life*

14

*Ins.*, 367 F. Supp. 2d 122, 132 (D. Mass. 2005). Rather, to prevail on an implied covenant claim, the plaintiff must "present evidence of bad faith or an absence of good faith," *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 238 (1st Cir. 2013), to "unfairly leverag[e] the contract terms for undue economic advantage," *Blake v. Professional Coin Grading Serv.*, 898 F. Supp. 2d 365, 389 (D. Mass. 2012). The requirement of good-faith performance is, however, circumscribed by the obligations set forth in the contract. "[T]he covenant may not be invoked to create rights and duties not contemplated by the provisions of the contract or the contractual relationship." *Speakman*, 367 F. Supp 2d at 132.

Here, MEAS contends that Exergen's claim for breach of the implied covenant merely repackages its breach of contract claim.[4] The counterclaim, however, does not simply allege that MEAS failed to perform under the contract. It contends that MEAS sought to raise the price on thermopiles that Exergen could not easily procure elsewhere during a period of heightened demand. It then refused to perform under the existing price unless Exergen conceded to its demands. Giving Exergen the benefit of all reasonable inferences, the counterclaim plausibly asserts that MEAS sought to leverage Exergen's reliance on its contract to extract a higher price for its own economic gain. (*See* Counterclaim ¶ 38). That is sufficient to state a plausible claim for breach of implied covenant of good faith and fair dealing.

### D.    Violation of Mass. Gen. Laws. ch. 93A (Count 3)

MEAS contends that Exergen's claim under Chapter 93A fails on two grounds.[5] First, it contends that the conduct did not occur primarily and substantially within Massachusetts and therefore does not meet the statute's geographic predicate. Second, it maintains that the

---

[4] MEAS also contends that the breach of the implied covenant claim fails because Virginia law does not recognize such a cause of action. That assertion does not survive the Court's finding that Massachusetts law applies.

[5] MEAS also contends that the Chapter 93A claim fails because Virginia law governs this dispute.

15

counterclaim does not allege sufficiently unfair or deceptive conduct within the meaning of the statute.

### 1.    Chapter 93A's Geographic Predicate

Chapter 93A prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws, ch. 93A § 2. Section 11 of Chapter 93A, "the business-to-business provision[ ] of the consumer protection statute," *Kunelius v. Town of Stow*, 588 F.3d 1, 15 (1st Cir. 2009), provides that no action may be brought under the statute unless the complained-of conduct occurred "primarily and substantially within the commonwealth," Mass. Gen. Laws ch. 93A, § 11.

The critical inquiry to determine whether the statute's geographic predicate is met is "whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth." *Kuwaiti Danish Comput. Co. v. Digital Equip. Corp.*, 438 Mass. 459, 473 (2003). That requires a holistic, fact-based analysis, considering factors such as "where the defendant commits the unfair or deceptive act or practice," "where the plaintiff receives or acts on the wrongful conduct," and "where the plaintiff sustained losses caused by the wrongful conduct." *KPM Analytics N. Am. Corp. v. Blue Sun Sci., LLC*, 729 F. Supp. 3d 84, 118 (D. Mass. 2024) (quoting *Kuwaiti*, 438 Mass. at 472 n.13). The question of whether the test has been met is a question of law. *In re Pharm. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 194 (1st Cir. 2009). And despite the fact-intensive nature of the analysis, a court may grant a motion to dismiss when the complaint fails to plead facts demonstrating that the center of the alleged misconduct was within Massachusetts. *See, e.g., CrunchTime! Info. Sys., Inc. v. Frischs Restaurants, Inc.*, 768 F. Supp. 3d 183, 186 (D. Mass. 2025).

"[W]hile the fact that a plaintiff suffered an injury in Massachusetts does not suffice by itself to satisfy the center-of-gravity test, the place of injury is a relevant factor in the analysis."

16

*Cynosure, LLC v. Reveal Lasers LLC*, 793 F. Supp. 3d 315, 355 (D. Mass. 2025) (internal citations omitted).  If the complaint alleges that "the plaintiff is located in Massachusetts and that the injury occurred in Massachusetts," it typically satisfies the geographic predicate at the motion-to-dismiss stage.  *Jofran Sales, Inc. v. Watkins & Shepard Trucking, Inc.*, 216 F. Supp. 3d 206, 216 (D. Mass. 2016).

The allegations of the counterclaim are sufficiently plausible to satisfy the geographic requirement at this stage.  The counterclaim alleges that Exergen was located in Massachusetts and that the unfair conduct occurred primarily substantially within Massachusetts. (Counterclaim ¶¶ 1, 74).  It is a reasonable inference that because Exergen is located in Massachusetts, its alleged lost profit damages were felt in Massachusetts and that the alleged unfair communications were directed at employees in Massachusetts.  At this stage, that is sufficient to avoid dismissal.

### 2.    **Unfair and Deceptive Conduct**

To be valid, a claim under Chapter 93A must allege "some form of deceptive or unfair conduct."  *States Res. Corp. v. The Architectural Team, Inc.*, 433 F.3d 73, 84 (1st Cir. 2005).  To determine whether a business practice is "unfair" under Chapter 93A, courts must consider "(1) whether the practice . . . is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."  *PMP Assocs., Inc. v. Globe Newspaper Co.*, 366 Mass. 593, 596 (1975) (citation modified).  To be actionable under § 11, the conduct in question must constitute an "extreme or egregious" business wrong or "commercial extortion," or rise to some similar level of "rascality" that raises "an eyebrow of someone inured to the rough and tumble of the world of commerce."  *Peabody Essex Museum, Inc. v. United States Fire Ins. Co.*, 802 F.3d 39, 54 (1st

Cir. 2015) (citing *Baker v. Goldman Sachs & Co.*, 771 F.3d 37, 49-51 (1st Cir. 2014); *Zabin v. Picciotto*, 73 Mass. App. Ct. 141, 169 (2008)).  The Supreme Judicial Court has recognized that threatening not to perform under a contract in order to coerce additional benefits not covered by the contract constitutes unfair conduct under Chapter 93A.  *H1 Lincoln, Inc. v. South Washington St., LLC*, 489 Mass. 1, 15 (2022) (citing cases).

Here, the counterclaim sufficiently states a claim for an "unfair" practice under Chapter 93A.  It contends Exergen threatened to withhold delivery of thermopile sensors to force MEAS to agree to a higher price than that which it was entitled to charge.  That conduct fits squarely within the "commercial extortion" line of cases*.  H1 Lincoln, Inc.*, 489 Mass. at 15 ("One form that commercial extortion takes is the use of breaches of contract, or threatened breaches, as leverage to extract additional benefits not covered by the contract").  The Court will therefore not dismiss the Chapter 93A claim.

## IV.    Conclusion

For the foregoing reasons, plaintiff and counterclaim defendant Measurement Specialties, Inc.'s motion to dismiss defendant and counterclaim plaintiff Exergen Corporation's counterclaim is DENIED.

**So Ordered.**

/s/  F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  August 12, 2026            United States District Judge